[Civ. No. 48954. First Dist., Div. Two. Aug. 6, 1980.]

HOUSTON GENERAL INSURANCE COMPANY, Petitioner, v. THE SUPERIOR COURT OF ALAMEDA COUNTY, Respondent; JAMES THOMSEN, Real Party in Interest.

**COUNSEL**

Gordon E. McClintock, Jacqueline A. Willson and Hession, Creedon, Hamlin, Kelly, Hanson & Williams for Petitioner.

No appearance for Respondent.

John F. MacGregor for Real Party in Interest.

## OPINION

**TAYLOR, P. J.**—In this discovery matter transferred to us by the Supreme Court, petitioner, Houston General Insurance Company, defendant in an action for damages for bad faith refusal to defend its insured (hereafter Houston), seeks a writ of mandate to compel respondent court to vacate an order requiring the production of excised portions of its claims file designated as a "file activity log" and directing Houston's representatives and attorney to be further deposed respecting matters disclosed by the log. The excised portions of the log allegedly contain notes of three telephone conversations had on October 19, 1977, between Houston's representative DeGuzman in Ft. Worth, Texas, and Houston's West Coast counsel Arnold in San Francisco concerning Houston's obligation to defend an action filed against its insured, Bevco Construction Company, by real party in interest, James Thomsen, plaintiff in this action (hereafter Thomsen). We have concluded that to compel disclosure of the excised portions of the log would violate Houston's lawyer-client privilege,[1] and that Houston's petition must be granted.

In 1974, Thomsen was injured in an accident in his home, allegedly due to the shattering of a glass shower door. In February 1975, Thomsen and his wife filed a personal injury action against the Bevco Construction Company (hereafter Bevco) and other defendants, alleging that Bevco was negligent in the construction of the home. Transamerica Insurance Company (hereafter Transamerica) initially assumed the defense of the action against Bevco, believing that it had coverage. It was subsequently revealed that Bevco had been insured by General Insurance Company, which had merged with Houston.

Through counsel for Transamerica, Bevco then tendered defense of the case to Houston, who disclaimed coverage and refused to defend. Transamerica continued to defend Bevco in the action set for trial on November 7, 1977, but announced that it would not pay the judgment. Prior to trial and pursuant to settlement, a judgment for $275,000 was entered against Bevco and its former officers. Thomsen, Bevco's assign-

---

[1]This is the second time Houston has petitioned this court for relief. On October 4, 1979, respondent court ordered Houston to produce the excised portions of the log for *in camera* inspection in order to rule on the privilege (see Evid. Code, § 915, subd. (a); *Grosslight* v. *Superior Court* (1977) 72 Cal.App.3d 502, 504 [140 Cal.Rptr. 278]). Prior to the hearing on the alternative writ issued by this court on December 4, 1979, respondent court vacated its order, and on January 28, 1980, we ordered the alternative writ discharged and the petition for writ of mandate dismissed.

ee, then filed an action against Houston seeking damages for bad faith refusal to defend. In the course of discovery proceedings, Thomsen learned of the existence of the log here in question and seeks to obtain the one and one-half pages of notes excised by Houston.

■ Houston contends that the excised portions of the log contain confidential communications between client and lawyer, as defined in section 952 of the Evidence Code,[2] and that such communications are protected by the lawyer-client privilege of section 954.[3]

Thomsen, Bevco's successor in interest, cites section 962 and argues that since Arnold was consulted by Houston upon a matter of common interest to Bevco and Houston, Houston may not claim the lawyer-client privilege as the communications between Houston and Arnold are to be offered in a civil proceeding between joint clients.[4]

Houston contends that although it consulted its San Francisco counsel regarding the claim, it never employed Arnold to assume the defense of the insured; that no joint client relationship was ever established between the insurer, the insured and the attorney, and that a joint client

---

[2]Evidence Code section 952 provides: "As used in this article, 'confidential communication between client and lawyer' means information transmitted between a client and his lawyer in the course of that relationship and in confidence by a means which, so far as the client is aware, discloses the information to no third persons other than those who are present to further the interest of the client in the consultation or those to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the lawyer is consulted, and includes a legal opinion formed and the advice given by the lawyer in the course of that relationship."
Unless otherwise indicated all future references are to the Evidence Code.

[3]Section 954 provides: "Subject to Section 912 and except as otherwise provided in this article, the client, whether or not a party, has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between client and lawyer if the privilege is claimed by:
"(a) The holder of the privilege;
"(b) A person who is authorized to claim the privilege by the holder of the privilege; or
"(c) The person who was the lawyer at the time of the confidential communication, but such person may not claim the privilege if there is no holder of the privilege in existence or if he is otherwise instructed by a person authorized to permit disclosure."

[4]Section 962 provides: "Where two or more clients have retained or consulted a lawyer upon a matter of common interest, none of them, nor the successor in interest of any of them, may claim a privilege under this article as to a communication made in the course of that relationship when such communication is offered in a civil proceeding between one of such clients (or his successor in interest) and another of such clients (or his successor in interest)."

relationship must be established before the joint client exception of section 962 is applicable to confidential communications. We agree.

 Under California law, a client has a statutory privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between client and lawyer (§ 950 et seq.).[5] A communication between such persons "is presumed to have been made in confidence and the opponent of the claim of privilege has the burden of proof to establish that the communication was not confidential" (§ 917; *North* v. *Superior Court* (1972) 8 Cal.3d 301, 310 [104 Cal. Rptr. 833, 502 P.2d 1305, 57 A.L.R.3d 155]).

The Supreme Court, long before the establishment of the statutory privilege, set forth the reasons for the privilege as follows: "The privilege is given on grounds of public policy in the belief that the benefits derived therefrom justify the risk that unjust decisions may sometimes result from the suppression of relevant evidence. Adequate legal representation in the ascertainment and enforcement of rights or the prosecution or defense of litigation compels a full disclosure of the facts by the client to his attorney. 'Unless he makes known to the lawyer all the facts, the advice which follows will be useless, if not misleading; the lawsuit will be conducted along improper lines, the trial will be full of surprises, much useless litigation may result. Thirdly, unless the client knows that his lawyer cannot be compelled to reveal what is told him, the client will suppress what he thinks to be unfavorable facts.' [Citation.] Given the privilege, a client may make such a disclosure without fear that his attorney may be forced to reveal the information confided to him. '[T]he absence of the privilege would convert the attorney habitually and inevitably into a mere informer for the benefit of the opponent.'" (*City & County of S.F.* v. *Superior Court* (1951) 37 Cal.2d 227, 235 [231 P.2d 26, 25 A.L.R.2d 1418]; in accord: *People* v. *Canfield* (1974) 12 Cal.3d 699, 705 [117 Cal.Rptr. 81, 527 P.2d 633].) The lawyer-client privilege is so pervasive that where a person seeks the assistance of an attorney with a view to employing him professionally, any information acquired by the attorney in the initial interview is privileged, whether or not actual employment follows (*People* v. *Canfield,*

---

[5]Section 951 defines a client as "a person who, directly or through an authorized representative, consults a lawyer for the purpose of retaining the lawyer or securing legal service or advice from him in his professional capacity...." The word "person" includes a corporation (§ 954).

*supra*, at p. 705; *Sullivan* v. *Superior Court* (1972) 29 Cal.App.3d 64, 69 [105 Cal.Rptr. 241]).

■ With the exception of a court appointment, the relationship of lawyer and client is created by contract (*American Mut. Liab. Ins. Co.* v. *Superior Court* (1974) 38 Cal.App.3d 579 [113 Cal.Rptr. 561]). "The contract may be express or implied [citation] and the general rules of agency apply. [Citation.] The attorney owes a fiduciary obligation to the client who usually is bound by the attorney's actions on his behalf. [Citation.] The existence of a contract is generally an issue and question of law. [Citation.]" (*American Mut. Liab. Ins. Co.* v. *Superior Court, supra*, at pp. 590-591.) A breach of an express or implied term of that contract may give rise to an action for legal malpractice (*Neel* v. *Magana, Olney, Levy, Cathcart & Gelfand* (1971) 6 Cal.3d 176, 180-181 [98 Cal.Rptr. 837, 491 P.2d 421]).

Neither party has seen fit to provide this court with the underlying pleadings in this action nor with a copy of the policy in question (see *Sherwood* v. *Superior Court* (1979) 24 Cal.3d 183, 186-187 [154 Cal. Rptr. 917, 593 P.2d 862]). ■ However, it has been held that a provision in a policy which requires the insured to permit the insurer's lawyer to defend claims against the insured amounts to a consent in advance by the insured to the *employment* of an attorney by the insurer to defend such claims. "Accordingly, and in such cases the attorney represents two clients, the insured and the insurer, and he owes to both a high duty of care imposed by statute (Bus. & Prof. Code, § 6068) and the rules governing professional conduct. [Citations.] Insofar as the insured is concerned the attorney owes him the same obligations of good faith and fidelity as if he had retained the attorney personally. [Citations.]" (*Lysick* v. *Walcom* (1968) 258 Cal.App.2d 136, 146 [65 Cal. Rptr. 406, 28 A.L.R.3d 368].)

■ Our review of the record in the instant case convinces us that an essential prerequisite for the establishment of a joint client relationship, i.e., the *employment* of the attorney by the insurance company *to defend the claim against the insured*, has not been established. Attorney Bishop, employed by Transamerica to defend Bevco in the original action, disclosed at his deposition that he had one discussion with Houston's representative DeGuzman prior to the time the case against Bevco was settled. This occurred at 9:44 a.m. on October 19, 1977, when Bishop returned DeGuzman's phone call. Bishop testified as follows: "Q. What was the content of that telephone discussion? A. He told me that

their denial of coverage was withdrawn *at this time* and told me to mark my file at their request to that fact and that they were retaining Arnold of Sedgwick's office *for an opinion*" (italics added).

At Arnold's deposition, during which the lawyer-client privilege was invoked, Arnold stated that he had three telephone conversations with Houston's claims specialist DeGuzman, all on October 19, 1977, that he was advised by DeGuzman that there was a serious coverage question, that he did not address the merits or offer advice with respect to the coverage question, and that his only recommendation was that "If [DeGuzman] was going to investigate the case, he should have a reservation of rights in that connection." Arnold further stated that he did not review any policy of insurance issued by General Insurance Company to Bevco, that he did not know whether Houston had a standard form reservation-of-rights letter, that he considered no particular California statutes or case authorities relative to the matter, and that he submitted no bill to Houston for his services with respect to this particular inquiry. Nor is there any showing that Arnold had reviewed the claim file or the complaint or any other pleadings in connection with his telephone discussions with DeGuzman or that he had any direct contact with Bevco.

Bishop testified that later that same day, October 19, 1977, he had a telephone discussion with Arnold as follows: "Q. What was the substance of that discussion? A. I called him and said I was available then and it would be convenient for me to see him, and he said that wasn't necessary because there'd been a change now. Q. Do you know what time of day? Was it early afternoon or late afternoon? A. Sometime between two and 3:30 or four."

■ Although it is well established that an insurer has a duty to defend its insured whenever the insurer ascertains facts which give rise to the *potential* of liability under the policy (*Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263, 277 [54 Cal.Rptr. 104, 419 P.2d 168]; *Mullen* v. *Glens Falls Ins. Co.* (1977) 73 Cal.App.3d 163, 172 [140 Cal.Rptr. 605]), the duty to defend is not without limitation; it includes only defense to those actions of the nature and kind covered by the policy (*Gray, supra*, at p. 274).[6] If the insurer, after investigating the facts,

---

[6]Houston continues to deny that any coverage existed for the Thomsen claim under the 1955 policy issued to its insured. Houston also contends that it was prejudiced by the late notice.

determines that there is no potential liability under the policy and refuses to defend the lawsuit "'...'"[t]his it does at its own risk, and if it later develops liability, or potential liability existed under the policy, the company will be held accountable to its insured, or to one who obtained judgment against its insured in the action it refused to defend." [Citations.]'" (*Mullen* v. *Glens Falls Ins. Co., supra*, at pp. 172-173; *Dillon* v. *Hartford Acc. & Indem. Co.* (1974) 38 Cal.App.3d 335, 340 [113 Cal.Rptr. 396]; *State Farm Mut. Auto. Ins. Co.* v. *Flynt* (1971) 17 Cal.App.3d 538, 548 [95 Cal.Rptr. 296].)

■ It is apparent from the foregoing that the lawyer-client privilege protected confidential communications between Arnold and Houston prior to Houston's acceptance of its obligation under the policy and its employment of an attorney to defend the action filed against its insured. Arnold was consulted with respect to the action filed by Thomsen against Bevco, and Arnold gave advice to Houston. But the record contains no evidence that Arnold or any other attorney was employed by Houston to defend the action. While the log states that Houston employees had "agreed to assign" the case to Arnold, there is no evidence that it was ever referred to Arnold except for an opinion.

Thomsen, relying on *Glacier Gen. Assurance Co.* v. *Superior Court* (1979) 95 Cal.App.3d 836 [157 Cal.Rptr. 435], argues that *any* communication between the insurer and the attorney which concerns the handling of the claim against the insured is necessarily a "matter of common interest," giving rise to the application of section 962. In contrast to the instant action for bad faith refusal to defend, however, the underlying action in Glacier was based on a claim of bad faith failure to settle a claim within the policy limits. *It is clear from the facts of that case that Glacier had engaged the services of a law firm to represent its insured in litigation which had proceeded to judgment.* During that period, the insured, the insurer and the attorney were all pursuing the *common goal* of defeating the claim against the insured. Their obligations to defend and cooperate were imposed by contract and professional duty (*Glacier*, at p. 839; see also *American Mut. Liab. Ins. Co.* v. *Superior Court, supra*, 38 Cal.App.3d, at p. 592). The court in *Glacier* emphasized that "when an insurer, as required by its contract of insurance, employs counsel to defend its insured, any communication with the lawyer concerning the handling of the claim against the insured, is necessarily a matter of common interest to both the insured and the insurer" (*Glacier, supra*, at p. 842).

We conclude that on the record before us, Thomsen had not met his burden of establishing that the communication between Houston and Arnold was not confidential. There is no showing that Arnold was ever employed by Houston to *defend its insured*; consequently, the tripartite relationship which would have imposed on the attorney the dual obligation to the insured and to the insurer never materialized. In the absence of the required showing, the lawyer-client privilege must be tested by section 952, and the joint client exception of section 962 is not applicable. Under section 952, a legal opinion formed and the advice given by the lawyer in the course of the lawyer-client relationship is clearly privileged.

In light of our conclusion, we need not discuss at length Houston's further argument that section 962 does not apply to communications made in confidence to the attorney by one of the joint clients at a time when the other client is not present. However, that issue appears to have been determined adversely to Houston's contention in *Glacier Gen. Assurance Co.* v. *Superior Court, supra*, 95 Cal.App.3d 836.

Let a peremptory writ of mandate issue to compel respondent court to set aside its order of January 15, 1980.

Miller, J., concurred.

**SMITH, J.**—I dissent.

The heart of petitioner's argument is its claim that during the critical period, October 18 and 19, 1977, its attorney-client relationship with Ernest Arnold, Esq., was exclusive. Petitioner, the insurer, claims this exclusivity shields certain parts of the petitioner's "file activity log" from discovery by the real party in interest, successor to the insured.

The trial court, on the other hand, held that this attorney-client relationship was tripartite including petitioner (Houston Insurance Company), Attorney Arnold, and the insured. There is substantial evidence to support this view.

The already known and discovered portions of insurer's "file activity log" indicate: (1) employees of petitioner met and "agreed that coverage exist [*sic*] in this loss"; (2) insurer's employee notation: "appears we may be involved and coverage of this loss exist . . ."; (3) a description of the injuries claimed; (4) assignment of case to Attorney Arnold; (5) ba-

sic facts of case discussed; and (6) petitioner's potential portion, $33,000, of the $105,000 suggested settlement was noted and reserved. Further, petitioner discussed with insured's initial attorney, Dwight Bishop, both the previously performed discovery and the settlement potential. Finally, petitioner requested of Bishop a copy of the entire litigation file.

Attorney Arnold admitted three separate conversations on October 19, 1977, with petitioner's employee, De Guzman. Upon being deposed, Arnold stated that the conversations were chiefly about the defense of the claim and not about coverage. Arnold did remember De Guzman saying that there was a "coverage question." Arnold remembered suggesting to De Guzman that a reservation of rights letter be sent.

Insured's Attorney Bishop testified that on October 19, 1977, he was contacted by insurer's employee De Guzman and informed that insurer had withdrawn its denial of coverage and had retained Attorney Arnold.

The above recitation of facts represents substantial evidence indicating a pattern of actions taken by both petitioner, Houston Insurance Company, and its counsel in furtherance of the common goal of the defense of insured.

This evidence was persuasive to the trial court.

The law is clear that "[w]here two or more clients have retained or consulted a lawyer upon a matter of common interest, none of them . . . may claim a [the attorney-client] privilege . . . as to a communication made in the course of that relationship when such communication is offered in a civil proceeding between one of such clients (or his successor in interest) and another of such clients." (Evid. Code, § 962.)

This general rule of evidence is particularly compelling when applied to the relationship that springs from an insurance policy with its implied-in-law covenant of good faith and fair dealing. (*Gruenberg* v. *Aetna Ins. Co.* (1973) 9 Cal.3d 566, 574 [108 Cal.Rptr. 480, 510 P.2d 1032].) Typically the insurer is bound under the policy to employ an attorney to defend the insured. The insurer is, and appropriately so, in control of the claim. This control is part of the insurer's business and precisely the service which the insured bargained for when the policy of insurance was purchased.

The lawyer hired is in a delicate position in this tripartite arrangement. He owes an obligation to each client in furtherance of the common goal to defend the claim. (*American Mut. Liab. Ins. Co.* v. *Superior Court* (1974) 38 Cal.App.3d 579, 592 [113 Cal.Rptr. 561]; *Glacier Gen. Assurance Co.* v. *Superior Court* (1979) 95 Cal.App.3d 836, 839 [157 Cal.Rptr. 435].) "Overall, however, the attorney's *primary* duty is to the insured." (*Glacier Gen. Assurance Co.* v. *Superior Court, supra*, at p. 839.)

This duty commences when there has been some action by, or in behalf of, the clients. Here, it is undisputed that petitioner, the insurer, was a client. Further, the trial court impliedly found substantial evidence establishing a fiduciary relationship between the insured and Attorney Arnold.

It is clear that petitioner, when talking to Attorney Arnold, was taking steps to defend the insured. This approach is substantiated by Arnold's testimony that the "coverage" question was mentioned only briefly and exclusively with regard to a "reservation of rights" letter. The mere fact that a "reservation of rights" letter was being discussed on October 19 indicated that a defense was underway and that the coverage question was, at least for the moment, set aside by the petitioner insurance company.

Petitioner also argues that both clients must be present to remove the shield of the privilege. This argument is without merit since "[t]he language [of section 962] that no client '*may claim a privilege...as to a communication made in the course of that relationship...*' (italics added) seem [*sic*] explicit and unambiguously to include *all* communications—bilateral as well as trilateral. If the Legislature had meant otherwise it could have easily said so. It is not for us to rewrite the statute." (*Glacier Gen. Assurance Co.* v. *Superior Court, supra*, at p. 841.)

Moreover, to hold that both clients must be present would give the insurer a preferred position over the insured. Bilateral communications between the insurer and the attorney in this tripartite relationship are to be expected given the roles of the parties. It is also expected that the insured will be a nonparticipant and unaware of most of these communications. But that does not diminish the "primacy of the duty the lawyer owes to the *insured*." (*Glacier Gen. Assurance Co.* v. *Superior Court, supra*, at p. 841; *American Mut. Liab. Ins. Co.* v. *Superior Court, supra*, at p. 592.)

In the present case the evidence indicates that the purpose of the insurer's conversations with the attorney was to formulate and execute the common plan of defense of the insured. The insured may not have been physically or electronically present but he was one of the multiple clients represented by the lawyer in question. All participants were concerned with a common legal problem and the insured enjoyed a primary position buttressed by a covenant of fair dealing. All of these factors give the insured access to the communication in question. To hold otherwise would impede the least knowledgeable and sophisticated of the individuals in the tripartite relationship.

While there may not have been direct contact between insured and Attorney Arnold, there was ample contact between those representing the insured: Attorney Bishop, insurer, and Attorney Arnold. For a short period, the parties' actions indicate a common plan of defense, which generated a tripartite attorney-client relationship.

An opposite holding would allow the insurer to commence discussions regarding a defense, take preliminary steps in this direction, calculate the exposure to its insured, and then withdraw its coverage, denying that the relationship ever existed as to the insured. All of these steps would be within the control of the insurer and beyond the insured. Such a holding would contravene both the insurer's duty of good faith and fair dealing to the insured, and, the attorney's primary duty to the insured.

As expressed in *Glacier Gen. Assurance Co.* v. *Superior Court, supra*, at pages 839 and 842, there may be subjects discussed by the lawyer and the insurer, for example, their general relationship or even the coverage question detached completely from the defense of the claim, that may be shielded by the attorney-client privilege. But here the trial court found that, at least during the albeit brief period of October 18 and 19, there existed a three-sided attorney-client relationship which would permit the insured (and its successor in interest) access to the "file activity log."

I would therefore deny the petition.

A petition for a rehearing was denied September 5, 1980. Smith, J., was of the opinion that the petition should be granted. The petition of real party in interest for a hearing by the Supreme Court was denied October 15, 1980.